1

**UNITED STATES DISTRICT COURT**

2

**DISTRICT OF NEVADA**

3

4    EUGENE A. MAUWEE, SR.                    )
                                            )        3:06-cv-00122-RCJ-VPC
5           Plaintiff,                       )
                                            )
6    vs.                                     )        **REPORT AND RECOMMENDATION**
                                            )        **OF U.S. MAGISTRATE JUDGE**
7                                            )
     BILL DONAT, *et al.*,                   )
8                                            )        May 28, 2009
            Defendants.                      )
9    _____)

10          This Report and Recommendation is made to the Honorable Robert C. Jones, United

11   States District Judge.  The action was referred to the undersigned Magistrate Judge pursuant to

12   28 U.S.C. § 636(b)(1)(B) and LR IB 1-4.  Before the court is defendants' motion for summary

13   judgment (#70).   Plaintiff opposed (#74).  Defendants did not file a reply.   The court has

14   thoroughly reviewed the record and the motions and recommends that defendants' motion for

15   summary judgment (#70) be granted in part and denied in part.

16                       **I. HISTORY & PROCEDURAL BACKGROUND**

17          Plaintiff Eugene Mauwee, Sr. ("plaintiff"), acting *in pro se*, is currently a prisoner at

18   Lovelock Correctional Center ("LCC") in the custody of the Nevada Department of Corrections

19   ("NDOC") (#40).  Plaintiff brings his first amended complaint pursuant to 42 U.S.C. § 1983, and

20   42 U.S.C. § 2000cc, the Religious Land Use and Institutionalized persons Act ("RLUIPA"),

21   alleging that prison officials violated his First and Fourteenth Amendment rights to free exercise

22   of religion and due process, and retaliated against him after he exercised his First Amendment

23   rights while incarcerated at Nevada State Prison ("NSP").  *Id*.  Plaintiff names as defendants Bill

24   Donat, NSP Warden; James Baca, NSP Associate Warden; and NDOC, ex. Rel. *Id*. The suit is

25   brought against all defendants in their individual and official capacities. *Id*.

26          In count I, plaintiff states that he is a Native American inmate and the *de facto*

27   spokesperson and leader of Native American spiritual practitioners. *Id*. Plaintiff contends that he

28   is obligated to enable and teach tribal inmates to practice their religious beliefs. Plaintiff alleges

1  that defendants violated his First and Fourteenth Amendment rights by allowing non-Native

2  protective custody inmates to use the general population inmates' sweat lodge grounds, which

3  desecrated the those grounds, prevented the Native American general population inmates from

4  practicing their religion, and violated their rights under AR 809. Plaintiff also asserts that

5  defendants used "ruses" to prevent him and other Native American inmates from using the sweat

6  lodge area to practice their religion. *Id*. In count II, plaintiff alleges that defendants transferred

7  him from NSP to LCC in retaliation for grievances plaintiff filed regarding defendants'

8  interference with his religious practice, as alleged in count I. *Id*.

9         The court notes that the plaintiff is proceeding *pro se*. "In civil cases where the plaintiff

10 appears *pro se*, the court must construe the pleadings liberally and must afford plaintiff the benefit

11 of any doubt." *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988); *see*

12 *also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

13                          **II. DISCUSSION & ANALYSIS**

14        **A.      Discussion**

15                **1.      Summary Judgment Standard**

16        Summary judgment allows courts to avoid unnecessary trials where no material factual

17 disputes exist. *Northwest Motorcycle Ass'n v. U.S. Dept. of Agriculture*, 18 F.3d 1468, 1471 (9th

18 Cir. 1994). The court grants summary judgment if no genuine issues of material fact remain in

19 dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(C).

20 In deciding whether to grant summary judgment, the court must view all evidence and any

21 inferences arising from the evidence in the light most favorable to the nonmoving party. *Bagdadi*

22 *v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). In inmate cases, the courts must

23              [d]istinguish between evidence of disputed facts and disputed
               matters of professional judgment. In respect to the latter, our
24              inferences must accord deference to the views of prison
               authorities. Unless a prisoner can point to sufficient evidence
25              regarding such issues of judgment to allow him to prevail on the
               merits, he cannot prevail at the summary judgment stage.
26
*Beard v. Banks*, 548 U.S. 521, 526, 126 S.Ct. 2572, 2576 (2006). Where reasonable minds could
27
differ on the material facts at issue, however, summary judgment should not be granted.
28

2

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

The moving party bears the burden of informing the court of the basis for its motion, and submitting evidence which demonstrates the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings but must set forth specific facts showing that there exists a genuine issue for trial. *Anderson*, 477 U.S. at 248. Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23.

**B.      Analysis**

**1.      Count I**

Plaintiff alleges that on or about January 10, 2006, defendants notified him that protective custody inmates would soon be permitted to use the Native American sweat lodge grounds (#40), p. 4A). Prior to this, no protective custody inmates were housed at NSP and only general population inmates used the sweat lodge grounds. Plaintiff immediately complained to defendants of the "impossibility of [the general population Native American inmates] to maintain spiritual continuity, of desecration of sweat lodge grounds and numerous violations of rights and regulations promulgated in permanent injunction and AR 809." *Id*. However, beginning on February 3, 2006, defendants permitted non-Native American protective custody inmates, who were not approved to use Native American grounds under AR 809, to use the sweat lodge area. *Id*. Plaintiff argues that this use "created known and intended result by defendants of desecration and destruction of [the] sweat lodge area for plaintiff's and [general population Native American inmates'] use." *Id*., p. 4B. The protective custody inmates were transferred back to LCC after an eight-month period. However, plaintiff contends that damage was done and "there is nothing to prevent defendant prison administrators or their brethren from repeating this violation of Native American rights to be free to practice their beliefs." *Id*. Therefore, plaintiff requests that the court

3

1    intervene to assure that NDOC sweat lodges are maintained as required by the "permanent

2    injunction" and RLUIPA. *Id*.

3        Plaintiff also alleges that defendants enacted numerous policies, based on "non-existent

4    and transparent ruses" to substantially burden plaintiff's practice of religion. These restrictive

5    policies and ruses included "tribe lacking outside sponsor, denying tribe use of plunge pool and

6    ordering use of bucket and hose instead, confiscation of accouterments necessary for sweat lodge

7    ceremony, excessive searching and seizure by correctional staff of sweat lodge grounds, and

8    confusing AR 810 (the AR for chapel use) with AR 809 (the AR for sweat lodge use)" (#40, p.

9    4A).

10       Defendants contend that the court should grant summary judgment in their favor because

11   they are protected by Eleventh Amendment and qualified immunity (#70, p. 6-9). Further,

12   plaintiff cannot prove that defendants violated his First and Fourteenth Amendment rights

13   because protective custody inmates are equally entitled to practice their religious faith, and

14   plaintiff does not have any enforceable rights under the *Mickel v. Wolff* Decree and Permanent

15   Injunction. *Id*. p. 9. Additionally, prison officials' decisions relating to plaintiff's religious

16   practice are entitled to deference. *Id*. p. 10-12. Finally, plaintiff is not entitled to relief under

17   RLUIPA because the "substantial burden" plaintiff complains defendants placed on his religious

18   practice is no longer in place, as prison policies have since been changed. *Id*. p. 12-13.

19       Plaintiff responds that defendants waived their Eleventh Amendment immunity under the

20   provisions of RLUIPA when they applied for and accepted federal funds (#74, p. 11-12).

21   Defendants are also not entitled to qualified immunity because the prison officials knew that the

22   protective custody inmates were not Native American; therefore, they could not have believed

23   that allowing these inmates to use the Native American grounds and sweat lodge was lawful. *Id*.

24   p. 12-13. Plaintiff acknowledges that, generally, Native American protective custody inmates

25   must be permitted to use the sweat lodge. However, he disputes that *non*-Native American

26   inmates have the same rights. *Id*. p. 14-15. Plaintiff's "argument is not whether protective custody

27   inmates should be allowed to practice their faith. Plaintiff's argument is that sweat lodge grounds

28   at NSP are sacred to Native American people both inside the prison and to the outside

community.... To send non-Native Americans whether [general population, protective custody], or any other classification to those grounds is a desecration not only to plaintiff but [to] Native people as a whole." *Id*. p. 15-16. Plaintiff also contends that defendants are liable under RLUIPA despite the fact that prison policies affecting his practice of religion have been rescinded. *Id*. p. 16-17.

### (i)        Eleventh Amendment Immunity

Defendants argue they are entitled to Eleventh Amendment Immunity because plaintiff has brought claims for money damages against them in their official capacities. Plaintiff contends that defendants waived their Eleventh Amendment Immunity under RLUIPA by accepting federal funding. The court agrees with plaintiff that in *Klein v. Crawford*, 3:05-cv-00463-RLH-RAM, the District Court held that when Congress conditions receipt of federal funds upon a State's amenability to suit under a federal statute, such as RLUIPA, the continued receipt of federal funds operates as a waiver of Eleventh Amendment state sovereign immunity.[1]

### (ii)        Mickel Consent Decree

Throughout count I of his complaint, plaintiff states that his right to practice his religion through sweat lodge rituals in an area that has not been used by non-Native Americans is protected by AR 809 and the "permanent injunction," which refers to the *Mickel* consent decree (#40). This consent decree was entered in 1980 in the case of *Mickel v. Wolff*, 3:79-cv-00239-LRH-VPC. This court previously found that plaintiff does not have standing to enforce the *Mickel* consent decree because he was not a party in *Mickel v. Wolff*, or a successor in interest to Mr. Mickel (#24, p. 7, 9). Therefore, plaintiff has "no authority to litigate enforcement of the Mickel decree." *Id*. p. 9-10.

### (iii)        First Amendment - Freedom of Religion

"The right to exercise religious practices and beliefs does not terminate at the prison door. The free exercise right, however, is necessarily limited by the fact of incarceration, and may be

---

[1]Defendants have not submitted evidence that NDOC does not receive federal funding. In *Klein*, the District Court noted "the observation [of the Supreme Court] in *Cutter* that all 50 states accept federal funding for their prisons." *Klein*, 3:05-cv-00463-RLH-RAM, p. 2.

5

1   curtailed in order to achieve legitimate correctional goals or to maintain prison security." *McElyea*

2   *v. Babbitt*, 833 F.2d 196, 197 (9th Cir. 1987) (per curium) (citations omitted). In order to implicate

3   the Free Exercise Clause, the prisoner's belief must be both sincerely held and rooted in religious

4   belief. *See Shakur v. Schriro*, 514 F.3d 878, 883-84 (9th Cir. 2008). In analyzing the legitimacy

5   of regulation of prisoners' religious expression, the court should utilize the *Turner* factors. *See*

6   *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987); *Turner v. Safley*, 482 U.S. 78, 89 (1987)

7   ("First, there must be a 'valid, rational connection' between the prison regulation and the

8   legitimate governmental interest put forward to justify it." Second,  the court must determine

9   "whether there are alternative means of exercising the right that remain open to prison inmates."

10  Third, the court must consider "the impact accommodation of the asserted constitutional right will

11  have on guards and other inmates, and on the allocation of prison resources generally." Fourth,

12  "the absence of ready alternatives is evidence of the reasonableness of a prison regulation.").

13                         **(a)        Policy changes to religious activity**

14          Plaintiff alleges that defendants changed numerous policies between November 2004 and

15  November 2005 that restricted his ability to practice his religion. Defendants argue that the court

16  should grant them deference because all the changes were made to further legitimate penological

17  goals. The court does not question the sincerity of plaintiff's religious beliefs. He is enrolled in

18  an outside tribe and he is the "Council/Spiritual Leader" for the general population Native

19  American group at LCC (#74, ex. H). Further, defendants' actions limited plaintiff's ability to

20  practice his religion. However, applying the *Turner* factors, the court agrees that the numerous

21  policy changes defendants enacted and then rescinded in 2004 and 2005 were rationally related

22  to legitimate penological interests based on the *Turner* factors.

23          First, defendants state that they enacted the new regulations, removing all outdoor cooking

24  stations, limiting inmates to the use of a five-gallon hose and bucket for ceremonial plunges, and

25  requiring inmates to have an outside sponsor to meet, for health, safety, and security purposes.

26  There is a valid, rational connection between such regulations and the  legitimate governmental

27  interests of health, safety, and security. These actions were meant to insure food was properly

28  cooked, that plunge pools were not used to create a security hazard, and that inmates were

                                                  6

1   properly supervised. These are all legitimate penological interests, and there is a valid rational

2   connection between them and the regulations. Second, it is unclear whether there are alternative

3   means of exercising the rights that remain open to prison inmates, as defendants have not

4   suggested any alternatives, and all of the regulations have been rescinded. Third, accommodation

5   of the asserted constitutional right would have an impact on guards and prison staff, as additional

6   supervision would be necessary for use of outdoor cooking stations and the plunge pool.

7   However, as these practices have been reinstated, the prison has been able to provide such

8   supervision to accommodate plaintiff's rights. Fourth, again, it is unclear whether there are other

9   alternatives to the regulations. Because there is a rational connection between defendants' actions

10   and a legitimate penological goal, defendants are entitled to deference. Therefore, summary

11   judgment is granted as to plaintiff's claims in count I related to the policy changes defendants

12   enacted in 2004 and 2005.

13               **(b)      Use of Sweat Lodge by Protective Custody Inmates**

14       Plaintiff alleges that defendants allowed non-Native American protective custody inmates

15   to use the sweat lodge grounds during an eight-month period, which desecrated the grounds and

16   impeded plaintiff's religious practice. Defendants argue that they were required to allow dual-use

17   of the sweat lodge grounds to give protective custody inmates an opportunity to also participate

18   in the sweat lodge ceremony. However, defendants do not explain whether non-Native American

19   inmates were permitted to participate in the sweat lodge ceremony, as plaintiff contends, or why

20   non-Native Americans would be allowed to use the grounds.

21       It is apparent that Native American protective custody inmates must be allowed to use the

22   sweat lodge grounds if they meet the requirements of AR 810 (or formerly of AR 809). However,

23   both AR 809 and AR 810 state that inmates must present some proof of Native American ancestry

24   or relationship before they are permitted to use the grounds. Specifically, AR 809, which was in

25   place when the protective custody inmates used the sweat lodge grounds, states:

26          Eligibility to Participate in Sweat Lodge Ceremony include[s]:
               •   Inmates who are enrolled in a federally recognized tribe;

27               •   Inmates who can demonstrate credible association with tribal
                  living;

28               •   Native American relatives, or those with acceptance and

1
2

       acknowledgment by a Native American tribe;
- Inmates from general population may not be invited to observe Sweat Lodge ceremonies.

3   AR 809.02.1.2 (#74, ex. F). AR 809 was replaced by AR 810 on June 9, 2008. AR 810 states:

4   "Consistent with Operational Procedures and Classification, Bureau of Indian Affairs and Code

5   of Federal Regulations inmates eligible to participate in Sweat Lodge Ceremony includes: a.

6   Inmates who are enrolled in a federally recognized tribe; or b. Inmates who can demonstrate

7   credible associate with tribal living via written documentation from a recognized tribe." AR

8   810.8.D (#74, ex. G).

9          Plaintiff has presented evidence that not all of the inmates that defendants allowed to use

10   the sweat lodge grounds met the criteria of AR 809. On May 3, 2006, correctional officer James

11   Parker sent a memorandum to defendant Baca, which included the names of twelve inmates who

12   were to be released to attend sweat lodge ceremonies.  Defendant Baca signed and approved this

13   memorandum on May 4, 2006 (#74, ex. H). Plaintiff also submits two lists of inmates who are

14   allowed access to the Native American Grounds at LCC. *Id*. Presumably, some of these inmates

15   were also the protective custody inmates housed at NSP for eight months. The names on these

16   three lists do not correspond, and numerous names from the memorandum are not on the LCC

17   access list. As defendants failed to file a reply, the court has no evidence which demonstrates that

18   the inmates listed on the memorandum are registered with a tribe or included on another access

19   list, which would give them a right to use the sweat lodge grounds at NSP. If these inmates did

20   not meet the criteria in AR 809, and were not permitted to use the sweat lodge grounds at LCC,

21   granting them access to the grounds at NSP was a violation of AR 809 and of plaintiff's rights.

22   Therefore, there is an issue of fact as to whether all of the protective custody inmates given

23   permission to use the sweat lodge grounds were Native American.

24          Defendants have not argued that their actions of allowing non-Native Americans to use

25   the sweat lodge grounds is rationally connected to any penological interest. The court also cannot

26   identify any penological goal that would be furthered by allowing non-Native Americans to use

27   the sweat lodge grounds, thus desecrating these grounds in the eyes of plaintiff and the other

28   Native American religious practitioners. Because there is an issue of fact as to whether all of the

protective custody inmates were Native American, and therefore permitted to use the sweat lodge grounds pursuant to AR 809, defendants' motion for summary judgment is denied as to plaintiff's allegations that defendants allowed the desecration of the Sweat lodge grounds in count I.

**(iv)**          **RLUIPA**

The Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.*, provides in relevant part:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). "Religious exercise" is defined as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). "A person may assert a violation of [RLUPIA] as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000cc-2(a).

To establish a RLUIPA violation, the plaintiff bears the initial burden to prove that the defendants' conduct places a "substantial burden" on his "religious exercise." *Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005). Once the plaintiff establishes a substantial burden, defendants must prove that the burden both furthers a compelling governmental interest and is the least restrictive means of achieving that interest. *Id*. at 995. RLUIPA is to be construed broadly in favor of the inmate. *See* 42 U.S.C. § 2000cc-3(g) ("This chapter shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution"). The Ninth Circuit has set out four factors for the RLUIPA analysis: (1) what "exercise of religion" is at issue; (2) whether there is a "burden," if any, imposed on that exercise of religion; (3) if there is a burden, whether it is "substantial;" and (4) if there is a "substantial burden," whether it is justified by a compelling governmental interest and is the least restrictive means of furthering that compelling interest. *Navajo Nation v. U.S. Forest*

9

1   *Service*, 479 F.3d 1024, 1033 (9ᵗʰ Cir. 2007), *aff'd en banc*, 535 F.3d 1058, 1068 (9ᵗʰ Cir. 2008).

2      Although RLUIPA does not define "substantial burden," the Ninth Circuit has stated that

3   a substantial burden is one that is "'oppressive' to a 'significantly great' extent. That is, a

4   'substantial burden, on 'religious exercise' must impose a significantly great restriction or onus

5   upon such exercise." *Warsoldier*, 418 F.3d at 995 (*quoting San Jose Christian coll. V. City of*

6   *Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004)). The burden need not concern a religious

7   practice that is compelled by, or central to, a system of religious belief, *see* 2000cc-5(7)(A);

8   however, the burden must be more than an inconvenience. *Navajo Nation*, 479 F.3d at 1033

9   (internal quotations and citations omitted). In fact, RLUIPA "bars inquiry into whether a

10  particular belief or practice is 'central' to a prisoner's religion." *Cutter v. Wilkenson*, 544 US

11  706, 725, n. 13 (2005). The burden must prevent the plaintiff "from engaging in [religious]

12  conduct or having a religious experience." *Navajo Nation*, 479 F.3d at 1033 (internal citations

13  omitted).

14     Courts must also take into account the burdens a requested accommodation may impose

15  on non-beneficiaries. *Cutter*, 544 U.S. at 720. In its analysis of the "compelling governmental

16  interest" standard, the court must exhibit a "particular sensitivity to security concerns" and be

17  "mindful of the urgency of discipline, order, safety, and security in penal institutions." *Id.* at 722-

18  23. To that end, the court should apply RLUIPA's standard with deference to the expertise of

19  prison administrators in establishing regulations that will maintain order consistent with the

20  consideration of costs and limited resources. *Id.* (internal citations omitted). Finally, the

21  Supreme Court has specifically noted that RLUIPA "does not differentiate among bona fide

22  faiths" and has stated that courts must be satisfied that RLUIPA's "prescriptions are and will be

23  administered neutrally among different faiths." *Id.* at 720, 723.

24     However, even if a governmental action has placed a substantial burden on religious

25  practice in the past, RLUIPA does not provide for injunctive relief if the government changes its

26  policy or practice. It states:

27          A government may avoid the preemptive force of any provision of
            this chapter by changing the policy or practice that results in a
28          substantial burden on religious exercise, by retaining the policy or

> practice and exempting the substantially burdened religious exercise, by providing exemptions from the policy or practice for application that substantially burden religious exercise, or by any other means that eliminates the substantial burden.

42 U.S.C. § 2000cc-3(e). If a prison changes its policy to eliminate any potential substantial burden on the practice of an inmate's religion, such change renders an inmate's RLUIPA claim moot. *See Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 762 (7th Cir. 2003).

### (a)   Injunctive Relief

In this case, all of NSP's policies which plaintiff claims place a substantial burden on his religious practice have been changed. All protective custody inmates have been transferred to LCC, and no longer use the sweat lodge (#70, p. 11). Further, the "ruses" that plaintiff refers to have been eliminated or changed. It is no longer necessary for the tribe to find an outside sponsor in order to use the sweat lodge. NSP's policies of removing all outdoor cooking stations and prohibiting inmates' use of a plunge pool, replacing such with a five-gallon bucket and hose, enacted in November 2004, were rescinded after approximately one month. *Id.* AR 810 replaced AR 809. As none of the policies plaintiff complains of still exist, plaintiff's claims for injunctive relief under RLUIPA are rendered moot based upon RLUIPA's safe harbor provision. 42 U.S.C. § 2000cc-3(e). Moreover, plaintiff has been transferred to LCC, which also moots his claims for injunctive relief against NSP defendants. Therefore, there are no issues of fact and summary judgment is granted as to plaintiff's demands for injunctive relief in count I.

### (b)   Damages

Plaintiff has requested compensatory and punitive damages in addition to injunctive relief.[2] Although 42 U.S.C. § 2000cc-3(e) moots plaintiff's claims for injunctive relief, "plaintiff may nevertheless be entitled to recover damages suffered during the time" defendants allegedly burdened his religious practice. *Petra Presbyterian Church v. Village of Northbrook*, 409 F.

---

[2]Although plaintiff does not specifically request nominal damages, the court must construe plaintiff's complaint liberally as he is appearing *in pro se*, and therefore the court will construe plaintiff's complaint to include a claim for nominal damages even though he has only specifically sought compensatory and punitive damages. *Oliver*, 289 F.3d at 630.

11

1   Supp. 2d 1001, 1005 (N.D. Ill. 2006) (discussing the Seventh Circuit's finding that 42 U.S.C. §

2   2000cc-3(e) moots any claims for injunctive relief); *see also Family Life Church v. City of Elgin*,

3   2007 WL 2790763 *5 (N.D. Ill. 2007) ("We do not read RLUIPA or *Civil Liberties* to stand for

4   the proposition that the corrective action can retroactively erase injuries already incurred as well

5   as the corresponding ability to sue for damages. Accordingly, plaintiff's claim for alleged

6   damages already incurred under RLUIPA survives this motion to dismiss.").

7           The law is unsettled as to whether plaintiff can sue defendants for damages in their

8   individual capacities under RLUIPA. The District Court examined the law on this issue in

9   *Shilling v. Crawford*, 536 F. Supp. 2d 1227 (D. Nev. 2008). The court discussed the issue in the

10  context of whether qualified immunity provided a defense to defendants sued for violations of

11  RLUIPA, as qualified immunity is only a defense to defendants sued in their individual capacities.

12  *Id*. at 1234. Ultimately, the court did not decide whether a plaintiff has the ability to sue

13  defendants in their individual capacities under RLUIPA because, in that case, "even if Plaintiff

14  could bring an individual capacity claim under RLUIPA, Defendants would be entitled to

15  qualified immunity." *Id*. at 1235. However, in coming to this conclusion, the court noted that the

16  Eleventh Circuit is the only Circuit Court of Appeals to squarely address whether individual

17  capacity suits are permitted under RLUIPA. The court stated that "other Circuit Courts  of

18  Appeals have assumed without discussion that RLUIPA permits suits against state officials in

19  their personal capacities. *Id*. at 1234 (citing *Shakur v. Schiriro*, 514 F.3d 878 (9th Cir. 2008)). In

20  *Smith v. Allen*, the Court of Appeals for the Eleventh Circuit "held RLUIPA does not permit

21  claims against officials in their individual capacities because construing RLUIPA to allow such

22  suits would raise serious constitutional concerns....the [Eleventh Circuit] reasoned that, as

23  spending power legislation, RLUIPA cannot reach state officials in their individual capacities.

24  Because only suits against individuals in their personal capacities implicate qualified immunity,

25  the Eleventh Circuit held that qualified immunity would have no application to RLUIPA claims."

26  *Id*., citing *Smith v. Allen*, 502 F.3d 1255, 1275 (11th Cir. 2007). However, the Eleventh Circuit

27  continued its analysis to consider whether RLUIPA allowed defendants to be sued for damages

28  in their official capacities. *Smith*, 502 F.3d at 1275. The court stated that "[s]o long as the

1   government entity receives notice and an opportunity to respond,"a plaintiff "may pursue a
2   RLUIPA action for 'appropriate relief' against [the defendants] in their official capacities as
3   officers of the [Alabama Department of Corrections]." *Id*. at 1275-76.

4        Under the PLRA, a prisoner may not recover damages for mental or emotional injury
5   "without a prior showing of physical injury." 42 U.S.C. § 1997e(e). The Ninth Circuit has held
6   that section of the PLRA applies only where a plaintiff has alleged mental or emotional injuries:
7   "To the extent that [plaintiff] has actionable claims for compensatory, nominal, or punitive
8   damages - premised on violations of his Fourteenth Amendment rights, and not on any alleged
9   mental or emotional injuries - we conclude the claims are not barred by § 1997e(e)." *Oliver v.*
10  *Keller*, 289 F.3d 623, 630 (9th Cir. 2002). Additionally, section 1997e(e) only restricts the
11  availability of certain types of damages, "while leaving open the possibility of nominal and
12  punitive damages." *Myron v. Terhune*, 225 Fed. Appx. 434, 437 (9th Cir. 2007).

13       Plaintiff has sued defendants in their individual and official capacities. Although the law
14  is unclear as to whether defendants can be sued in their in their individual capacities for damages,
15  even if such a suit was not contemplated by RLUIPA, plaintiff would nonetheless be able to bring
16  a suit against defendants in their official capacities, as there is no evidence that defendants did
17  not receive notice of plaintiff's claim or an opportunity to respond. Plaintiff has alleged violations
18  of his First Amendment and Fourteenth Amendment rights and violations of RLUIPA, rather than
19  any mental or emotional injuries. Therefore, section 1997e(e) does not bar plaintiff's claims for
20  compensatory, nominal or punitive damages.  Plaintiff has alleged that by allowing non-Native
21  American inmates to use the sweat lodge grounds, defendants substantially burdened his religious
22  exercise. This burden would have prevented plaintiff "from engaging in [religious] conduct or
23  having a religious experience." *Navajo Nation*, 479 F.3d at 1033. Again, there is an issue of fact
24  as to whether defendants permitted non-Native American inmates to use the sweat lodge grounds.
25  Although RLUPA precludes plaintiff from seeking injunctive relief because defendants have
26  changed their policies, plaintiff nonetheless has a right to pursue his claims for damages based
27  on violations of the First Amendment and RLUIPA.

28

1          **(iv)              Qualified Immunity**

2          Defendants argue that they did not violate plaintiff's religious rights by allowing

3    protective custody inmates to use the sweat lodge grounds on Saturdays, as general population

4    inmates were still permitted to use the grounds on Sundays (#70, p. 8). "[B]y allowing both

5    protective custody inmates and general population inmates to utilize the Sweat Lodge grounds,

6    the Defendants had no reason to believe they were violating Plaintiff's constitutional rights. *Id*.

7    p. 9. Plaintiff contends that defendants are misstating his argument. Plaintiff does not believe that

8    only general population inmates have a right to use the sweat lodge grounds; rather, he asserts that

9    only Native American inmates have the right to use the sweat lodge grounds, and that by allowing

10   non-Native inmates, whether protective custody or general population, to use the grounds,

11   defendants allowed the grounds to be desecrated, placing a substantial burden on plaintiff's ability

12   to practice his religion. Further, a reasonable officer would have known that by allowing non-

13   Native American's to use the grounds, he was violating plaintiff's rights, as AR 809 clearly states

14   that an inmate "must hold some type of Native American Heritage in order to participate in sweat

15   lodge ceremonies." *Id*. p. 13. Plaintiff maintains that the "failure by NDOC staff and particurely

16   (sic) defendants Donat and Baca to insure that all those inmates who participate in the sacred

17   sweat lodge ceremonies are verified Native Americans is a violation of American Religious

18   Freedom Act [of] 1994, 16 U.S.C. 668-668d ... and the AR 809, which gains its authority from

19   said act." *Id*. p. 13-14.

20          "The doctrine of qualified immunity protects government officials from liability for civil

21   damages insofar as their conduct does not violate clearly established statutory or constitutional

22   rights of which a reasonable person would have known." *Pearson v. Callahan*, 129 S. Ct. 808,

23   815 (2009) (internal quotation marks omitted). "For a constitutional right to be clearly

24   established, its contours must be sufficiently clear that a reasonable official would understand that

25   what he is doing violates that rights. This is not to say that an official action is protected by

26   qualified immunity unless the very action in question has previously been held unlawful; but it

27   is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*,

28   536 U.S. 730, 739 (2002) (citation omitted).

1       "Although earlier cases involving 'fundamentally similar' facts can provide especially

2 strong support for a conclusion that the law is clearly established, they are not necessary to such

3 a finding." *Id*. At 741. Accordingly, qualified immunity will be denied if a case involves "the

4 mere application of settled law to a new factual permutation." *Porter v. Bowen*, 496 F.3d 1009,

5 1026 (9th Cir. 2007). However, even if the violated right was clearly established, it may be

6 difficult for an officer to fully appreciate how the legal constraints apply to the specific situation

7 he or she faces. *Motley v. Parks*, 432 F.3d 1072, 1077 (9th Cir. 2005 (en banc)). "Under such

8 circumstance, if the officer's mistake as to what the law requires is reasonable,...the officer is

9 entitled to the immunity defense." *Id*. (brackets and internal quotation marks omitted). In essence,

10 "[o]fficers are entitled to qualified immunity unless they have been given fair notice that their

11 conduct was unreasonable in light of the specific context of the case." *Winterrowd v. Nelson*, 480

12 F.3d 1181, 1186 (9th Cir. 2007) (internal quotation marks omitted).

13       Prior to *Pearson v. Callahan*, 129 S. Ct. 808 (2009), the Supreme Court mandated a two-

14 step framework for deciding the issue of qualified immunity. First, courts were to decide whether

15 "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the

16 officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If

17 the court answered this question affirmatively, the court would then ask whether the constitutional

18 right was clearly established. *Id*. In *Pearson*, the Supreme Court reconsidered the two-step

19 framework and held that courts are not required to address whether there was a constitutional

20 violation before deciding whether the constitutional right at issue was clearly established. 129 S.

21 Ct. at 818. However, the Supreme Court also stated that courts may continue to follow the two-

22 step framework as a matter of discretion. *Id*.

23       The court agrees with plaintiff that defendants did not address his actual concern that non-

24 Native Americans were permitted to use the sweat lodge grounds. As discussed above, Native

25 American protective custody inmates must be allowed to use the sweat lodge grounds if they meet

26 the requirements of AR 810 (or formerly of AR 809). However, both AR 809 and AR 810 state

27 that inmates must present some proof of Native American ancestry or relationship before they are

28 permitted to use the grounds.  Plaintiff has presented evidence that not all of the inmates that

1    defendants allowed to use the Sweat lodge grounds met the criteria of AR 809. If these inmates

2    did not meet the criteria in AR 809, and were not permitted to use the sweat lodge grounds at

3    LCC, a reasonable officer would have known that granting them access to the grounds at NSP

4    would be a violation of AR 809 and of plaintiff's rights. Therefore, defendants are not entitled

5    to qualified immunity.

6         As such, defendants motion for summary judgment is granted as to plaintiff's claims for

7    injunctive relief and denied as to plaintiff's claims for damages.

8                    **2.          Count II**

9         Plaintiff alleges that since July 2006, defendants have retaliated against him for writing

10   grievances and commencing the instant lawsuit against them  regarding the burdens defendants

11   have placed on his religious practice, as alleged in count I (#40, p. 5). Specifically, plaintiff

12   contends that in July 2006, defendants "transferred plaintiff, without any cause whatsoever, to the

13   more restrictive LCC," in retaliation for plaintiff exercising his First Amendment right to free

14   speech. *Id*.  Plaintiff claims that this retaliatory transfer has harmed him in several ways, including

15   loss of his prison job, loss of preferred housing, loss of frequency of visits, loss of property, and

16   subjecting plaintiff to further retaliation at LCC. *Id*. p. 5-5A. Plaintiff states that since his transfer,

17   LCC staff have also retaliated against him by temporarily confiscating his religious items and

18   artifacts, and creating difficulty and delays on plaintiff to practice his religion at LCC. *Id*.

19        Defendants argue that plaintiff cannot prove the elements of First Amendment retaliation;

20   therefore, the court should grant the motion for summary judgment as to count II (#70, p. 13).

21   First, defendants contend that plaintiff was transferred due to his failure to cooperate in a

22   homicide investigation, not because his engaged in protected speech. *Id*. p. 14. Moreover, plaintiff

23   does not have a liberty interest in being housed in a particular institution, nor does he have a

24   protecting interest against transfer. *Id*. Finally, defendants lack personal involvement with respect

25   to plaintiff's First Amendment religion claim in count II because plaintiff alleges his rights were

26   violated by LCC staff, and the named defendants are all employed at NSP. *Id*. p. 15.

27        Plaintiff claims that he cooperated to the extent that he could in defendants' investigation

28   of another inmate's murder, and that he does not know who was responsible for the murder (#74,

                                      16

p. 19). Additionally, defendants never mentioned plaintiff's failure to cooperate in this murder investigation as the reason for his transfer in their responses to his informal and first level grievances. Rather, it was not until their response to his second level grievance that defendants "decided to use the excuse of failure to participate in a homicide investigation as a reason for transferring plaintiff to LCC. *Id*. Plaintiff also states that of the numerous people who were questioned about the murder, he was the only inmate was transferred. *Id*. Therefore, this demonstrates that plaintiff's transfer was not based on any failure to participate in the murder investigation, and that the transfer was retaliatory. *Id*. p. 20.

Prisoners have a right to meaningful access to the courts, and prison authorities may not penalize or retaliate against an inmate for exercising this right. *Bradley v. Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995). Prison officials may be sued under Section 1983 for retaliating against a prisoner for exercising his or her constitutional rights. *Pratt v. Rowland*, 65 F.3d 802, 806 & n.4 (9th Cir. 1995). A retaliation claim involves five elements: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2004).

Although an inmate alleging a retaliatory transfer has "no constitutionally-protected liberty interest in being held at, or remaining at, a given facility," an inmate need not establish "an independent constitutional interest in...assignment to a given prison...because the crux of his claim is that state officials violated his *First Amendment* rights by retaliating against him for his protected speech activities." *Pratt*, 65 F.3d at 806 (emphasis in original). Retaliation claims must be evaluated in light of the deference accorded to prison officials. *Id*. at 807. The inmate bears the burden of pleading and proving the absence of legitimate correctional goals for the alleged retaliatory action. *Id*. at 806; *Bruce v. Ylst*, 351 F.3d 1283, 1288 (9th Cir. 2003). The Ninth Circuit has recognized that "timing can properly be considered as circumstantial evidence of retaliatory intent." *Pratt*, 65 F.3d at 808.

Even viewing the evidence in the light most favorable to plaintiff, plaintiff has presented

no conclusive evidence to lead the court to believe defendants retaliated against him. Defendants submit two affidavits which state that plaintiff was transferred because "he did not cooperate with investigators"during a homicide investigation and "he appeared to be hiding information relating to this homicide investigation" (#70, ex. B, C). Plaintiff alleges that he was the only inmate who was transferred due to the homicide investigation (#74, p. 20). However, plaintiff submits no evidence to verify this statement, or to rebut defendants' affidavits. In a motion for summary judgment, plaintiff is required to submit some evidence to show there is an issue of material fact for trial, and may not rest upon mere allegations or denials in the pleadings. Additionally, plaintiff alleges that employees at LCC continued to violate his rights after he was transferred because they delayed plaintiff's ability to practice his religion and temporarily confiscated his religious property (#40, p. 5A). Defendants argue that they lack personal involvement in any infringement of plaintiff's rights that may have occurred at LCC because they are all employed at NSP, and the court agrees. None of the defendants is employed at LCC and it is improbable they would have been personally involved in actions taken at LCC. Further, plaintiff has submitted no evidence to demonstrate that defendants' actions were somehow related to actions that took place at LCC. Because plaintiff has not introduced evidence sufficient to raise any issues of fact, summary judgment is granted as to count II.

### III. CONCLUSION

Based on the foregoing and for good cause appearing, the court concludes:

Count I: There is an issue of fact as to whether defendants permitted non-Native American inmates to use the sweat lodge grounds, and whether such use caused desecration to the sweat lodge grounds. However, as the allegedly non-Native American inmates have been transferred, plaintiff's claims for injunctive relief are moot. There are no issues of fact as to whether plaintiff's First Amendment rights were violated when defendants temporarily enacted numerous restrictive regulations which affected plaintiff's religious practice. Defendants have demonstrated that such restrictions were rationally related to a legitimate penological goal. Therefore, defendants' motion for summary judgment (#40) is granted as to plaintiff's claim for injunctive relief with regard to the protective custody inmates' use of the sweat lodge and as to plaintiff's

claims regarding defendants' temporary regulation changes. Defendants' motion for summary judgment is denied as to plaintiff's claim for damages with regard to the protective custody inmates' use of the sweat lodge.

Count II: Plaintiff has not presented evidence to demonstrate that defendants retaliated against him for exercising his First Amendment rights when they transferred him to LCC. Therefore, defendants' motion for summary judgment (#40) is granted as to count II.

As such, the court recommends that defendants' motion for summary judgment (#70) be **GRANTED** in part and **DENIED** in part.

The parties are advised:

1.    Pursuant to 28 U.S.C.  § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, the parties may file specific written objections to this report and recommendation within ten days of receipt.  These objections should be entitled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2.    This report and recommendation is not an appealable order and any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.

## IV.  RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that defendants' motion for summary judgment (#70) be **GRANTED** in part and **DENIED** in part.

**DATED:** May 28, 2009.

_____

**UNITED STATES MAGISTRATE JUDGE**